[No. 1769.]

### Peter Alexander *v.* The State.

Murder — Fact Case.— See the statement of the case for evidence *held* insufficient to support a conviction for murder of the second degree, because it discloses circumstances tending to mitigate, excuse or justify the homicide.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. Gustave Cook.

The conviction was for murder in the second degree, the indictment upon which it was based alleging the murder of Sam Lane, in Harris county, Texas, on the 21st day of September, 1884.

Sandy McGee was the first witness for the State. He testified in substance that he knew the deceased Sam Lane, who was killed in Harris county, Texas, on or about September 21, 1884. The killing occurred on Sunday morning about 9 o'clock. Sam Lane was coming up the road, when the defendant hallooed to him not to approach any nearer, as he, Lane, had threatened to kill him, Alexander. Lane replied that he would go where he pleased, and cursed Alexander. Lane then stood near the fence, within fifteen feet of Alexander's gate. He said that he had come to camp right there all day. Lane persisted in cursing Alexander, swearing at and abusing him, and asserting that he would kill him before sundown on that day. Lane then put his hand on his pistol and Alexander shot him dead. Witness saw Lane's body after death, and saw a loaded pistol in his pocket.

It was about 8 o'clock in the morning when Lane went to Alexander's. When he first came up to the fence Alexander told him

to go away, and asked: "Don't you know you are violating the law?" Lane replied: "D—n the law." The defendant could easily have shot Lane when Lane first came to the fence. Witness was a brother-in-law to the defendant.

Albert McGee was the next witness for the State. He testified that he knew Sam Lane prior to his death. The defendant lived at the witness's house, and was the son-in-law of the witness. Witness was in the house at the time of the killing, but did not see it. He was then lying on his bed. He heard the defendant talking to Lane, and heard Lane cursing the defendant. He heard the shot fired, but could not see it, as it was fired from the gallery. Lizzie Alexander, Sandy McGee, Floretta McGee and witness were the only persons present when Sam Lane was shot.

Floretta McGee testified, for the State, that she was the mother-in-law of the defendant and knew Sam Lane. On Wednesday prior to the Sunday of the killing the defendant was at the house of "Uncle Elam," playing the fiddle for others to dance. While thus engaged Sam Lane approached the defendant and said to him: "I will give you two bits to quit playing that d—d fiddle." Defendant paid no attention to this remark, when the deceased went up to him and said: "I will give you four bits to stop playing that d—d fiddle." Defendant paid no attention to Sam Lane, but played the piece through, and when he got up to leave he remarked to the witness: "It seems very much as if Sam Lane is determined to insult me." Sam Lane overheard him and remarked: "It was my intention to insult you, and if you don't like it you can just help yourself." The defendant did not reply at all, but went home. The day before the killing witness saw Sam Lane again. The defendant came to a house where the witness was, to get some water. He filled two buckets and started off with one in each hand, when witness called to him: "Here are your three shirts I have washed and done up; take them along." Lane came up in time to overhear the witness, and to hear the defendant reply: "Please take them to my house for me, as I cannot carry both buckets of water and the shirts too." Lane spoke up, saying: "I'll be d—d if she shall." Then speaking to witness he said: "Let the d—d lazy son of a b—h carry his own shirts." Defendant said nothing in reply to this denunciation, and Lane went up to him with his knife in his hand, and said: "G—d d—n you, I have a good notion to wring my knife-blade off in your heart." Defendant sat both buckets down, raised up his hands and said: "For God's sake don't kill me; I have never done you any harm!" Lane replied: "Then

get!" and defendant picked up his buckets and shirts and left. Lane then said to witness: "I will kill that son of a b——h before the sun is up to-morrow." Witness told defendant of this threat that night.

Witness was in the house next morning when the shooting took place. Sam Lane was coming up the road towards the house when defendant called to him not to come any further, as he, Lane, had threatened his life, and he would not permit a closer approach. Lane, cursing and swearing at the defendant, said that he had come there to camp all day, and that he would kill defendant before night, or before the sun went down. Witness was then in the house looking out of the window. The defendant was on the gallery. Lane persisted in his abuse and oaths for nearly an hour, when the defendant went into the house, got his gun, returned to the gallery and told Lane to go away,— that he was violating the law. During this time he had his gun pointed downwards. Lane replied: "D——n the law," and said that he would kill the defendant before the sun went down. Defendant then raised his gun and fired, and Lane fell dead. Witness knew the general reputation of Sam Lane. He was regarded as a desperate man, and as one who would carry out his threats.

Lizzie Alexander was the next witness for the State. She testified that she was in the house with the defendant, Sandy McGee, Albert McGee, and Floretta McGee on the Sunday morning that the shooting of Lane occurred. Sam Lane came up the road to the fence near the gate, and said that he was going to camp at that place all day, and kill the defendant before sundown. He kept up his abuse of the defendant for nearly an hour, and then made a motion as if to draw his pistol, when the defendant fired and killed him. Before he fired the defendant said to Lane: "Please go away; you are violating the law." Lane replied: "G——d d——n the law." Alexander replied: "You had better obey the law, than be in the cold clay." He held his gun at this time muzzle down. Lane then attempted to draw his pistol and defendant fired. Defendant was making no hostile demonstrations with his gun when Lane attempted to draw his pistol. He could easily have killed Lane when he first came up to the fence, had he wanted to. When the fatal shot was fired, the parties, deceased and defendant, were about fifty feet apart. Sam Lane was in the habit of carrying a pistol.

Charles Morse and Will Anthony testified, for the State, that they were acquainted with the general reputations of the defendant and the deceased. The former was regarded as a peaceable, law-abiding

man; and the latter a desperate, violent man, who would readily carry into execution any threats he might make.

The motion for new trial reviewed the evidence in detail, and denounced it as insufficient to support the conviction, and claimed that the newly-discovered evidence of Doc Williams entitled the defendant to a new trial. It also assailed the verdict as an unfair expression of the finding of the jury, alleging that when on the first ballot the jury was found to stand eight for conviction against four for acquittal, it was agreed that the verdict would be rendered according to the vote of the majority on the second ballot, which resulted as the first, and the verdict was so rendered.

The testimony of Doc Williams in support of the motion for new trial was as follows: " My name is Doc Williams. I am the man who made the affidavit in this case. On the day of the killing Sam Lane put his pistol in his pocket and said that he was going to kill Peter Alexander. I told Peter Alexander what Sam Lane had said, on the day of the killing and before the day when Peter Alexander was tried. I told him all about it the evening after Sam Lane was killed."

*Fisher & Kirlicks*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for murder of the second degree, the punishment being five years' confinement in the penitentiary. The charge of the court is correct to the extent to which it goes. There was no error in refusing the motion for new trial, upon the grounds set forth in the motion, except as is hereafter pointed out.

The only question presented in this record is whether the evidence supports the verdict. To convict of murder the State must prove beyond a reasonable doubt that the homicide was committed in the absence of circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide. For *murder* is distinguishable from every other species of homicide, because the killing was in the *absence* of such circumstances as would reduce it to negligent homicide or manslaughter, or excuse or justify the killing. In the case at bar, the uncontradicted testimony of all the witnesses who speak to the fact not only fails to show the absence of the circumstances of reductions, but with great certainty and remarkable unanimity, considering the nature of witnesses, establishes the presence of such circumstances of reduction

or justification.   But it is urged by our assistant attorney general that, as the witnesses were related to defendant, their testimony should have been scrutinized closely by the jury. · This does not help the State, for the absence of the circumstances which reduce or justify must be shown to make out a case of murder.   There is no conflict in the testimony of any of the witnesses bearing upon this point.

Again, it may be insisted that the jury had the right to believe the witnesses when they speak to the fact that defendant shot and killed deceased, but to disregard their testimony when they speak to the fact of the presence of the circumstances of reduction or justification or excuse of the homicide.   The record fails to show a circumstance of the slightest suspicious character bearing upon the testimony regarding the presence of such circumstances of reduction or justification; and while it is true that the jury are the judges of the credibility of the witnesses, it does not follow that without grounds or reason they can discard and hold for naught at their will and pleasure the testimony of the witnesses, especially in a case in which there is no conflict nor suspicion cast upon their evidence.

We are not satisfied with the conviction because we think it is not supported by the evidence, and we will remand the cause for another trial.   We would suggest that the learned judge upon another trial instruct the jury that defendant is not required to retreat.   We are not to be understood that because of this omission in the charge of the court the judgment should be reversed, but we think under the facts of this case the above charge would be proper.

Because the court erred in overruling the motion for a new trial, the judgment is reversed and the cause remanded.

<i>Reversed and remanded.</i>

[Opinion delivered March 14, 1885.]